# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1201

_____

| | |
|---|---|
| DCS Sanitation Management, Inc., | * |
| | * |
| Appellant, | * |
| | *  Appeal from the United States |
| v. | *  District Court for the |
| | *  District of Nebraska. |
| Eloy Castillo; Efren George Castillo; | * |
| Adolfo Martinez, | * |
| | * |
| Appellees. | * |

_____

Submitted:  October 14, 2005
Filed:  January 25, 2006

_____

Before RILEY, JOHN R. GIBSON, and COLLOTON, Circuit Judges.

_____

RILEY, Circuit Judge.

DCS Sanitation Management, Inc. (DCS) sued three of its former employees, Eloy Castillo, Efren George Castillo, and Adolfo Martinez (collectively, former employees), alleging the former employees breached noncompete agreements.  DCS appeals the district court's[1] denial of DCS's motion for a preliminary injunction and grant of summary judgment in favor of the former employees.  We affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

## I.    BACKGROUND

DCS, a Delaware corporation with its principal place of business in Ohio, cleans food processing plants in thirteen states, including Nebraska. DCS's corporate office in Ohio (1) formulates processes and procedures to improve cleaning crew efficiency, (2) designs sanitation and safety programs for all cleaning crews, (3) makes staffing decisions for all cleaning crews, and (4) makes human resource policies and decisions for all DCS employees.

The former employees worked for DCS as on-site managers at the Tyson Foods plant in Dakota City, Nebraska (Tyson plant). The former employees (1) had access to DCS's staffing, sanitation, and safety programs, including the allocation and monitoring of proper chemical dilutions; (2) were responsible for enforcing regulatory safety requirements and satisfying third party audit requirements; (3) were familiar with staffing requirements for cleaning the Tyson plant; and (4) had knowledge of the Tyson plant's key contacts and business requirements.

As a condition of employment with DCS, each of the former employees signed identical employment agreements (Agreements) with DCS. The Agreements contained the following noncompete provision:

> NONCOMPETITION AFTER TERMINATION: For a period of one (1) year following the date of termination of employment for any reason, I will not directly or indirectly engage in, or in any manner be concerned with or employed by any person, firm, or corporation in competition with [DCS] or engaged in providing contract cleaning services within a radius of one-hundred (100) miles of any customer of [DCS] or with any customer or client of [DCS] or any entity or enterprise having business dealings with [DCS] which is then providing its own cleaning services in-house or which requests my assistance or knowledge of contract cleaning services to provide its own cleaning services in-house. In the event of violation of this covenant, [DCS], in addition to any other rights and remedies available at law or otherwise, is entitled to an injunction to

be issued by a court of competent jurisdiction enjoining and restraining employee from committing any violation of this provision and employee hereby consents to the issuance of the injunction.

The Agreements also contained a choice-of-law provision: "<u>APPLICABLE LAW:</u> This Agreement shall be subject to and interpreted in accordance with the laws of Ohio."

In June 2003, after DCS cleaned the processing side of the Tyson plant for eighteen years, the Tyson plant solicited bids from competing cleaning companies. As a result of the bidding process, on September 18, 2003, the Tyson plant selected Packers Sanitation Services, Inc. (Packers) for the cleaning contract. Packers hired all of DCS's employees, including the former employees, and on November 8, 2003, Packers started cleaning the Tyson plant.

On May 14, 2004, DCS sued the former employees, alleging (1) breach of the noncompete agreements, (2) a "substantial probability" the former employees would disclose DCS's trade secrets and confidential information, and (3) breach of contract. DCS sought (1) to enjoin the former employees in accordance with the noncompete agreements, (2) to enjoin the former employees from disclosing DCS's trade secrets and confidential information, and (3) money damages.

DCS moved for a preliminary injunction, and the former employees moved for summary judgment. The district court denied DCS's motion for a preliminary injunction and granted summary judgment in favor of the former employees, concluding Nebraska has a materially greater interest in the noncompete agreements at issue, and application of Ohio law would violate a fundamental policy of Nebraska law. The district court thus applied Nebraska law to determine the validity of the noncompete agreements and concluded the noncompete agreements were overbroad and, therefore, unenforceable.

DCS appeals the district court's ruling, urging this court to reverse the district court's entry of summary judgment and denial of a preliminary injunction, and to remand with instructions to enjoin the former employees under Ohio law. DCS argues reversal and remand is warranted here, because (1) the district court erred in applying Nebraska law instead of Ohio law, (2) the noncompete agreements are enforceable under Ohio law, and (3) the district court abused its discretion in denying injunctive relief for the period of the covenant from the date of the court's order. In response, the former employees contend (1) the appeal is moot, (2) the district court correctly applied Nebraska law, (3) the noncompete agreements are overly broad and unenforceable, and (4) the noncompete agreements are contracts of adhesion.

## II.    DISCUSSION
### A.    Mootness

The former employees contend this appeal is moot, because the one-year time frame of the noncompete agreements has expired. See Agrigenetics, Inc. v. Rose, 62 F.3d 268, 270-71 (8th Cir. 1995) (holding, under Nebraska law, when a noncompete agreement's time period runs out, an appeal from the denial of a preliminary injunction is moot). Although an appeal from a denial of injunctive relief may become moot by the passage of time, a claim for damages remains viable. See Curtis Indus., Inc. v. Livingston, 30 F.3d 96, 97 (8th Cir. 1994). Because DCS sought money damages in addition to injunctive relief, this appeal is not moot.

### B.    Choice-of-Law Determination

DCS argues the district court erred when it evaluated DCS's claim under Nebraska law rather than Ohio law, because the Agreements specify Ohio law governs. A district court sitting in diversity jurisdiction applies the conflict of law rules for the state in which it sits. Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 687 (8th Cir. 2001) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Thus, we apply Nebraska's conflict of law rules and review de novo the district court's choice-of-law determination. Id.

In deciding choice-of-law questions, Nebraska follows the Restatement (Second) of Conflict of Laws (Restatement). Id. Nebraska courts generally give effect to the parties' choice of law. Vanice v. Oehm, 526 N.W.2d 648, 651 (Neb. 1995); Restatement § 187(1). Restatement section 187(1) provides "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement § 187(1). Section 187(2) provides the parties' contractual choice of law will apply unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2)(a), (b).

The district court applied Restatement section 187(2) without analyzing whether section 187(1) or section 187(2) applies in this case. Section 187(2) applies only when section 187(1) does not govern. See Restatement § 187, comment d. Section 187(1) is inapplicable in this case, because, under Nebraska law, the parties could not have resolved to apply Ohio law even with an explicit provision. See CAE Vanguard, Inc. v. Newman, 518 N.W.2d 652, 656 (Neb. 1994) (holding "[t]he provision of the agreement which states that a court may reform the covenant is of no effect. Private parties may not confer upon the court powers which it does not possess."); see also Baxter Intern., Inc. v. Morris, 976 F.2d 1189, 1196 (8th Cir. 1992).

The first condition under section 187(2), whether "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," is met in this case. Restatement § 187(2)(a). Nebraska has a substantial relationship to the parties and the transaction, because the

-5-

former employees and DCS entered into the Agreements in Nebraska, the services at issue were to be performed in Nebraska, the former employees reside in Nebraska, the prohibition of the noncompete clause directly and materially affects employment in Nebraska, and DCS does business in Nebraska. Nebraska clearly possesses a direct and substantial interest in the employment of its citizens. The only relationship between Ohio and the parties is the location of DCS's corporate headquarters and principal place of business in Ohio. The Agreements were not negotiated, entered into, or performed in Ohio. Under these circumstances, the district court properly concluded Ohio has no substantial relationship to the parties or the transaction, and Nebraska has a greater material interest in the Agreements. See Powell v. Am. Charter Fed. Sav. & Loan Ass'n, 514 N.W.2d 326, 332 (Neb. 1994) (deciding the state with the most significant relationship to the transaction and the parties is the state where the parties contracted, negotiated, and resided; where the subject matter was located; and where performance was to take place).

The second condition also is satisfied. Under section 187(2)(b), application of the chosen law is precluded if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" when the factors articulated in section 188[2] are applied. Restatement

---

[2]Section 188 provides in pertinent part:
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

§ 187(2)(b). Nebraska and Ohio courts have materially different approaches to the reformation of unreasonable noncompete agreements. In Nebraska, if a court determines a noncompete agreement is unreasonable, the court will not reform the noncompete agreement in order to make it enforceable. H & R Block Tax Servs., Inc., v. Circle A Enters., Inc., 693 N.W.2d 548, 552 (Neb. 2005). Contrary to the Nebraska courts' approach, Ohio courts are empowered to reform overly broad or unreasonable noncompete agreements to make them reasonable. Raimonde v. Van Vlerah, 325 N.E.2d 544, 547 (Ohio 1975). The district court correctly recognized that because Nebraska courts expressly have rejected judicial reformation of noncompete agreements, application of Ohio law would violate a fundamental policy of Nebraska law.

Because Nebraska has a greater material interest in the Agreements and application of Ohio law would violate a fundamental policy of Nebraska law, we hold the district court correctly applied Nebraska law to the question of the validity and enforceability of the noncompete agreements. See First Nat'l Bank v. Daggett, 497 N.W.2d 358, 363 (Neb. 1993) (disregarding choice-of-law provision because the chosen state had no contacts with the transaction and the parties, and application of the chosen state's law would offend a strong public policy in the forum state). See also Rain & Hail Ins. Serv., Inc. v. Casper, 902 F.2d 699, 700-01 (8th Cir. 1990) (applying Nebraska law to an employment agreement's noncompete clause choosing the application of Iowa law, which allowed modification of overly restrictive noncompete provisions, and affirming conclusion "Iowa law would be contrary to a fundamental policy of Nebraska").

### C.    Validity of the Noncompete Agreements

Having concluded Nebraska law applies, we now turn to whether the noncompete agreements are valid under Nebraska law. Pursuant to Nebraska law, a noncompete agreement is valid if it is (1) "not injurious to the public," (2) "not greater than is reasonably necessary to protect the employer in some legitimate interest," and

(3) "not unduly harsh and oppressive on the employee." Prof'l Bus. Servs. Co. v. Rosno, 680 N.W.2d 176, 184 (Neb. 2004) (quotation omitted). "An employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but is not entitled to protection against ordinary competition from a former employee." Id. at 185. A noncompete agreement "may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact." Polly v. Ray D. Hilderman & Co., 407 N.W.2d 751, 756 (Neb. 1987).

We conclude the district court properly held the noncompete agreements were overbroad and unenforceable. The district court recognized the noncompete agreements prohibit the former employees from, directly or indirectly, being concerned in any manner with any company in competition with DCS, and from providing contract cleaning services within one hundred miles of any entity or enterprise "having business dealings" with DCS, including attorneys, accountants, delivery services and the like. The breadth of the noncompete agreements effectively put the former employees out of the cleaning business within an extensive region. We hold the district court did not err in concluding Nebraska courts would not enforce such overly broad noncompete agreements. See Rosno, 680 N.W.2d at 186-87 (holding noncompete agreement was overly broad where the agreement prohibited the former employee from soliciting or contacting any of the former employer's clients and where the former employer could not establish the former employee had done business with or had substantial personal contact with all of the former employer's clients); Mertz v. Pharmacists Mut. Ins. Co., 625 N.W.2d 197, 205 (Neb. 2001) (holding noncompete agreement was overly broad where it was not limited to clients with whom the former employee actually did business or personally contacted); Moore v. Eggers Consulting Co., Inc., 562 N.W.2d 534, 540 (Neb. 1997) (holding noncompete agreement was overly broad where it prohibited soliciting or accepting business opportunities with any client of the former employer with whom the former

employee worked or had knowledge of, and where the agreement contained an overly broad geographical restriction); <u>Whitten v. Malcolm</u>, 541 N.W.2d 45, 48 (Neb. 1995) (holding noncompete agreement was overly broad where it prohibited practicing dentistry within geographic location and was not limited to clients with whom the former employee did business and had personal contact and was not even limited to the former employer's existing customer base); <u>Vlasin v. Len Johnson & Co., Inc.</u>, 455 N.W.2d 772, 776 (Neb. 1990) (holding noncompete agreement was overly broad where it prohibited the former employee from entering into insurance business within fifty miles and was not limited to the former employer's clients with whom the former employee did business and had personal contact); <u>Polly</u>, 407 N.W.2d at 756 (holding noncompete agreement was overly broad where it prohibited soliciting or working for the former employer's clients with whom the former employee did not work and did not even know).

## III. CONCLUSION

Therefore, we affirm the well reasoned judgment of the district court.

_____